UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-21736-CV-ALTONAGA/OTAZO-REYES

CHARLES MICAUD,

     Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Charles Micaud's ("Claimant") Motion for Summary Judgment (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 12] and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 14]. The administrative transcript (hereafter, "TR.") has been filed [D.E. 11].[1] For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

## PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits ("DIB") and an application for supplemental security income ("SSI") on January 29, 2020, alleging a disability onset date of August 1, 2015. TR. 135. The applications were denied initially and upon reconsideration. Id.

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

Upon Claimant's written request, a hearing was held on July 12, 2022, before Administrative Law

Judge Kurt Ehrman ("ALJ Ehrman"), at which Claimant and Vocational Expert John McKinney

("VE McKinney") testified.  Id. at 135, 145.

On August 12, 2022, ALJ Ehrman issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2016.  Id. at 138.

(2) Claimant had not engaged in substantial gainful activity since August 1, 2015, the alleged disability onset date (20 C.F.R. § 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: Status post bilateral knee arthropathy and replacements, and lumbar spondylolisthesis, with moderate stenosis (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id. at 139.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to additional limitations.  Id.[3]

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical work activities on a sustained basis, despite the claimant's limitations or impairments. 20 C.F.R. § 416.945(a)(1).  The RFC must be determined based on all the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 416.920 and 416.945.

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing 10 pounds.  Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 416.967(b).

(6) Claimant was able to perform his past relevant work as a Commercial Photographer. (20 C.F.R. §§ 404.1565 and 416.965). Id. at 144.[4]

(7) Claimant had not been under a disability, as defined in the Social Security Act, from August 1, 2015, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)). Id. at 145.

On January 23, 2023, the Appeals Council denied a request for review of ALJ Ehrman's Unfavorable Decision. Id. at 5–10. On May 9, 2023, pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Claimant filed this action, seeking reversal of ALJ Ehrman's final administrative decision [D.E. 1].

In support of his contention that ALJ Ehrman's Unfavorable Decision should be reversed, Claimant argues that:

I.     The ALJ's step-four analysis was incorrect because he failed to characterize Claimant's past relevant work of Commercial Photographer as a composite job.

II.     The ALJ's finding that Claimant was able to perform his past relevant work is not supported by substantial evidence.

See Claimant's Motion for Summary Judgment [D.E. 12]. The undersigned finds no merit in either of these contentions.

## RELEVANT MEDICAL EVIDENCE

### I. Mental Health Providers

#### A. Treating Sources

##### 1) Virginia Mason Medical Center

On November 30, 2016, Claimant visited Virginia Mason Medical Center to discuss medications to manage his anxiety and to discuss getting into a medical detox program for alcohol use that had resumed after Claimant had been sober for 20 years. Tr. 697, 702. At the time,

---

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

Claimant was on Clonazepam and planned on weaning off that medication.  Id. at 702. He also reported that he planned on returning to rehabilitation treatment for alcohol addiction.  Id.  Upon examination, Claimant was pleasant, alert and had normal speech and mood.  Id. Claimant was referred to an inpatient rehabilitation center for treatment.  Id.

On December 8, 2016, Claimant presented for a follow-up consultation regarding his use of Clonazepam to manage his anxiety and alcohol dependence.  Id. at 695.  Claimant reported that he was trying to wean off the medication and that his sister had been managing his medications for him; Claimant planned on meeting with a psychiatrist at the end of that month.  Id.  Claimant's mood, speech, and affect appeared normal.  Id. at 696.

On December 29, 2016, Claimant presented to a specialist at Virginia Mason Medical Center for a psychiatric evaluation.  Id. at 762.  Claimant described his substance abuse as having started in his late twenties, with drinking a fifth of hard liquor a day and taking drugs.  Id.  He eventually became sober but returned to drinking in 2016 following what he described as a number of psychological stressors including financial, employment, and housing difficulties.  Id.  Claimant had been treated with psychiatric medication in the past; Claimant denied any past or present symptoms of psychosis and denied any past or present suicide attempts.  Id. at 763.  Upon examination, Claimant appeared cooperative with good hygiene and exhibited normal movement and behavior, with a linear and logical thought process and normal mood and affect.  Id. at 764. Claimant was prescribed Gabapentin to promote abstinence from alcohol and was advised to continue taking Hydroxyzine for anxiety and to follow-up in three months to assess his progress. Id.

In July 2017, Claimant reported having mild to moderate anxiety and depression and self-reported that he consumed 1-2 drinks every other day.  Id. at 554.  His mental health provider felt

that Claimant was stable to proceed with knee surgery in July 2017.  Id.

On November 17, 2017, Claimant presented for management of his medication.  Id. at 847. Claimant reported that, following his double knee replacement surgery, he began taking prescribed opioid pain medication and started to become addicted.  Id.  Upon realizing this, he stopped taking the pain medication but started drinking alcohol in its place.  Id.  Claimant reported attempting to detox but had "the shakes" while doing so; thus, he committed to reporting to a rehabilitation facility in December 2017.  Id.  Upon mental status examination, Claimant had an anxious affect but was cooperative and exhibited normal speech and behavior.  Id.  Claimant's prescription of Venlaxafine was increased to help treat his alcohol use disorder.  Id. at 848.

On December 5, 2017, Claimant complained of anxiety and relapsed in his alcohol use, drinking up to two pints of whiskey a day.  Id. at 631.  Claimant denied having any seizures; he requested a Librium taper to manage his relapse.  Id.  Upon examination, his speech and mood were normal, and he was alert and oriented.  Id. at 632.

On April 25, 2018, Claimant presented with alcohol withdrawal symptoms and complained of shaking and feeling unwell.  Id. at 646.  Claimant acknowledged his drinking problem, and his sister was present for support and to administer his Librium taper.  Id.  Claimant reported that he had been sober for 15 years but relapsed after a failed relationship.  Id.  Apart from his alcohol withdrawal symptoms, Claimant presented as normal upon a mental examination.  Id.

On June 12, 2018, Claimant was treated for alcohol abuse and inquired about different medications to manage his cravings.  Id. at 641.  He had a prior history of repeated relapses and was prescribed Baclofen to manage his cravings.  Id.  His anxiety medication was also decreased. Id.  A complete review of Claimant's systems was normal.  Id.

On August 30, 2018, Claimant presented for a follow-up appointment for management of

his medications for depression, anxiety, and alcohol use disorder.  Id. at 816.  Claimant reported feeling depressed and fatigued and having difficulty sleeping and concentrating.  Id.  Upon examination, Claimant's mood was anxious but otherwise he had normal affect and behavior.  Id. at 819.  Claimant's prescription of Venlafaxine was increased to help manage his generalized anxiety.  Id. at 816, 820.

On March 22, 2019, Claimant presented at Virginia Mason Medical Center for an annual preventative care visit.  Id. at 582.  Claimant presented as doing "fairly well" with his anxiety disorder and reported that he had quit alcohol for the past 70 days after an inpatient stay and after taking Naltrexone, which he planned to continue taking for up to 2 years.  Id.  He also presented with attention deficit disorder ("ADD"), for which he was receiving medication but reported that he was not having good control of his symptoms.  Id.

On April 26, 2019, Claimant presented for medication management.  Id. at 777.  Claimant reported worsening anxiety and depression as side effects of the medication Wellbutrin.  Id. at 778. Claimant also reported difficulty concentrating and focusing, which he claimed impacted his ability to find work and function during the day.  Id.  Upon examination, Claimant was easily distracted, and had a tired mood, but exhibited normal speech and affect.  Id.  at 780.  Claimant was ruled out as having bipolar disorder and ADHD.  Id. at 777.  Claimant's doctor noted that Claimant had been unable to tolerate higher doses of Bupropion to target symptoms of ADD and discussed adding stimulant medications to assist his sobriety and decrease his level of fatigue, along with a low dose of Modafinil to manage his ADD symptoms.  Id. at 780–81.

On June 28, 2019, Claimant presented for a follow-up evaluation and complained of extreme anxiety, restlessness, and irritability as side effects from his medication Strattera.  Id. at 766. Claimant reported feeling better after he discontinued the medication.  Id.  Upon examination,

Claimant had an anxious and depressed mood and an anxious affect with fast-paced speech.  Id. at 767.  Claimant's psychiatrist recommended re-evaluating him for possible bipolar disorder and instructed Claimant to follow-up in two weeks.  Id.

On July 10, 2019, Claimant presented for a follow-up evaluation for anxiety disorder, ADHD, and severe alcohol use disorder.  Id. at 624.  Claimant reported that he experienced side-effects from his ADHD medication that he did not like; and that he had skipped his most recent dose of Naltrexone.  Id.  However, Claimant reported relapsing while off the injectable Naltrexone and was therefore prescribed more injections.  Id.

On August 26, 2019, Claimant complained of fatigue and low motivation from the Vivitrol medication but stated that he was otherwise doing well on it and had not had a recurrence of other symptoms.  Id. at 620. Claimant was prescribed vitamin B12.  Id.

On March 26, 2019, Claimant returned to Virginia Mason Medical Center to manage his alcohol use disorder through Librium and continued Naltrexone injection therapy.  Id. at 597.  Claimant's anxiety and depression were adequately controlled through psychiatric therapy.  Id.

On January 25, 2020, Claimant returned to Virginia Mason Medical Center for a follow-up visit; he reported being in remission and doing well on Vivitrol.  Id. at 603.  His doctor recommended continuing Vivitrol for 2 years past initial sobriety.  Id.  Claimant's depression and anxiety were reported as stable while undergoing continued psychiatric therapy.  Id.  Claimant's mood, affect, speech and behavior were normal.  Id.

On April 28, 2020, Claimant requested assistance with alcohol detoxification.  Id. at 916.  Claimant stated that he had lost his job during the Covid-19 pandemic and had begun drinking again; he further reported early withdrawal symptoms of shakiness, sweating and difficulty focusing.  Id.  Claimant was referred for alcohol detoxification.  Id.

### 2)   Kitsap Mental Health Services ("Kitsap")

On April 24, 2017, Claimant reported to Kitsap for a psychiatric evaluation.  Id. at 981–82.  Claimant reported a history of depression but denied suicidal ideation.  Id. at 986.  At the time, Claimant reported being unemployed and feeling stressed and isolated from a lack of social support, owing money to the IRS, losing his job, and getting divorced.  Id. at 986, 990, 992, 1009.  Claimant presented as talkative with normal orientation and affect and appropriate and logical though process.  Id. at 1000.  Claimant was diagnosed with depressive disorder.  Id. at 997.  Claimant was referred to therapy but began skipping appointments.  Id. at 1016–20.

### 3)   HealthPsych Associates, Inc. ("HealthPsych")

On February 22, 2021, Claimant presented to HealthPsych for a mental status evaluation as part of his application for Social Security benefits.  Id. at 930.  Claimant reported a history of depression and substance abuse but denied suicidal ideation.  Id. at 930–31.  He further reported sleep and appetite disruptions from anxiety and stated that he smoked one pack of cigarettes a day and continues to drink alcohol daily but that he had completed a detoxification program two days prior to presenting to HealthPsych.  Id. at 931. Claimant appeared well-groomed, had no prominent gait abnormalities, and no fine motor shakes or tremors; he was pleasant and cooperative.  Id. at 932.  Claimant also appeared alert and oriented, had good memory recall, and could complete various verbal and mathematical exercises.  Id.  Claimant was diagnosed with Bipolar II Disorder, Alcohol Use Disorder, and Polysubstance Use Disorder that was in sustained full remission; he was directed to continue with all current medications and psychiatric therapy.  Id. at 932–33.

### 4)   Comprehensive MedPsych Systems ("MedPsych")

On March 3, 2021, Claimant visited MedPsych for a psychiatric evaluation, complaining of alcohol abuse.  Id. at 946.  Claimant denied symptoms of depression and admitted that drinking

brought out a depressed mood in him but that he became anxious when he stopped drinking.  Id.
Claimant stated that his main stressor was financial pressure from not working.  Id.  Claimant was
diagnosed with moderate alcohol use disorder and was told to increase therapy with Alcoholics
Anonymous ("AA") to daily sessions.  Id. at 947–48.

On March 30, 2021, Claimant reported feeling better and that AA meetings had helped
manage his anxiety and sobriety.  Id. at 950.  Claimant was calm and cooperative with a normal
mood and affect.  Id. at 952.  However, on May 11, 2021, Claimant reported relapsing after
becoming frustrated with AA meetings and feeling as though he wasn't making friends in the
group.  Id. at 954.  Claimant also reiterated that he was subject to financial stressors and stated that
he was selling some of his belongings to obtain some money.  Id.

On June 9, 2021, Claimant reported completing step 7 of 12 in his AA meetings and feeling
that he had a strong support system that helped him stop drinking.  Id. at 958.  Claimant was calm
and cooperative with a normal mood and affect and good memory.  Id. Claimant reported working
for Uber Eats and stated he would apply to other jobs once he completed all the steps to sobriety.
Id.

On August 18, 2021, Claimant reported being sober for 111 days and continuing to attend
AA meetings.  Id. at 966.  Claimant denied feeling depressed but remained stressed about finding
a job as a photographer.  Id.  Claimant was calm and cooperative and had a goal-directed and
logical thought process.  Id. at 968.

### B.  Non-treating Sources

#### 1)  State Agency Psychological Consultant George Grubbs, Psy.D. ("Dr. Grubbs")

On March 5, 2021, Dr. Grubbs completed a residual functional capacity assessment of
Claimant. Tr. 86.  He opined that Claimant had no limitations with understanding or concentrating,

had good memory recall of recent and remote events, and could perform simple math calculations. Id. at 75, 76, 84, 86. Dr. Grubbs also opined that Claimant's judgment and insight were adequate and that there was no evidence of a formal thought disorder. Id. at 84. However, Dr. Grubbs noted that Claimant's mood was mildly depressed and anxious. Id. Overall, Dr. Grubbs concluded that, based on the objective evidence, Claimant did not have any severe mental health impairments. Id. at 75, 76, 85–86.

### 2) State Agency Psychological Consultant Madelyn Miranda-DeCollibus, Psy.D. ("Dr. Miranda-DeCollibus")

On November 15, 2021, Dr. Miranda-DeCollibus performed a reevaluation of Claimant and agreed with Dr. Grubbs' findings, concluding that Claimant did not have any severe mental health impairments. Id. at 116–118.

## II.    Physical Health Providers

### A. Treating Sources

#### 1) Radiology Associates of Brooklyn, LLP

X-ray images from December 2013, prior to the alleged onset date of August 1, 2015, showed mild degenerative changes of the thoracic spine. Tr. 1027–28.

#### 2) Spine and Sports Medicine of New York

On February 12, 2016, Claimant presented to Spine and Sports Medicine of New York, complaining of low back pain and knee pain that had gotten worse over the past two years. Id. at 476. Claimant complained of numbness and tingling in the lumbosacral region and described the pain as dull and throbbing, especially when sitting. Id. Claimant reported receiving acupuncture in April 2015 with 50% improvement for one day before the pain worsened. Id. An MRI of Claimant's spine from 2014 revealed a grade 1 spinal disorder of a slipped vertebra in his lower back, and a disc bulge and minor herniation. Id. Upon examination, Claimant was in no apparent

distress and had a normal gait and range of motion in all extremities; in addition, straight leg raising tests were negative bilaterally and there was no paraspinal tenderness.  Id. at 477.  Treatment notes indicate that Claimant was taking a trip to Peru for an Amazonian retreat for a detox program.  Id. Claimant was diagnosed with osteoarthritis in both knees, and it was recommended that he start regenerative medication treatments upon his return from Peru.  Id.

### 3) Virginia Mason Medical Center

On September 6, 2016, Claimant sought treatment from Virginia Mason Medical Center to primarily discuss substance detoxification but also complained of knee pain.  Tr. 706.  Upon physical examination, Claimant's joint lines in his knees were nontender, his Lachman's test was negative, and his range of motion was normal with no crepitation.  Id.

On December 8, 2016, Claimant presented to Virginia Mason Medical Center for a follow-up examination, and, at that time, Claimant's physical examination was within normal limits with no signs of limited mobility or abnormal walking.  Id. at 695-96.

On January 17, 2017, Claimant sought treatment for pain in both of his knees that had been ongoing for over ten years.  Id. at 710. Claimant had undergone a meniscectomy in one of his knees and had been told by his previous orthopedist that he had lost much of the cartilage in his knees.  Id.  Claimant reported having significant pain after walking four blocks.  Id.  Claimant reported that he was exploring undergoing knee replacement surgery after completion of treatment for alcohol addiction at a rehabilitation center.  Id.

On March 30, 2017, Claimant presented to Virginia Mason Medical Center complaining of 6/10 bilateral knee pain that worsened with activity and that had been ongoing for the past five years.  Id. at 688.  Upon physical examination, Claimant appeared very bow-legged and walked with a limp.  Id.  X-rays showed a KL grade 4 arthritis in the medial compartment of both knees.

Id. at 689.  Claimant had previously been treated with anti-inflammatory injections that did not help.  Claimant was therefore recommended as a good candidate for bilateral knee replacement. Id.

On July 23, 2017, Claimant complained of severe daily pain in both knees that interfered with his daily activities.  Id. at 554.  Upon physical examination, Claimant presented with no apparent distress and was alert and cooperative.  Id. at 555.  Claimant's reported pain at rest that was 2-3 out of 10 in severity; an examination of both knees showed a false looseness of the knee joint.  Id.  Claimant ambulated with an antalgic gait.  Claimant was diagnosed with bilateral knee degenerative joint disease and was recommended for a total knee replacement surgery.  Id. at 554–55.  Claimant agreed to proceed with the surgery.  Id. at 558.

On August 7, 2017, Claimant underwent bilateral knee replacement without complications. Id.  Claimant underwent daily physical and occupational therapy and met the criteria for discharge 2 days after surgery.  Id.  However, Claimant required a front-wheeled walker to carry out his functional mobility tasks.  Id. at 571. Claimant was instructed to continue physical therapy as an outpatient.  Id. at 560.  At the time of discharge, Claimant reported minimal pain in his knees.  Id. at 574.

On August 11, 2017, Claimant presented for a follow-up consultation following his bilateral knee replacement.  Id. at 684.  Claimant reported that he was pleased with his walking distance of about 1 mile and that he could climb stairs without any significant pain.  Id.  Upon examination, Claimant demonstrated satisfactory alignment, a normal gait, and ability to perform straight leg raises.  Id.  Claimant was scheduled for an additional follow-up visit.  Id.

On November 7, 2017, Claimant presented for a follow-up consultation regarding his bilateral knee replacement.  Id. at 680.  Claimant reported no pain 3-months post-surgery.  He did

not need a cane or assistive device to walk and could climb stairs without the use of a railing. <u>Id.</u> Claimant reported that he was feeling much better than before the surgery, and that he could walk without pain. <u>Id.</u>

On August 26, 2019, Claimant complained of thumb and wrist pain that was made worse by prolonged use of the computer. <u>Id.</u> at 620–21. Upon physical examination, Claimant had good range of motion. <u>Id.</u> Claimant was prescribed x-ray evaluations for his thumb and wrist pain for possible arthritis. <u>Id.</u> at 620.

On September 11, 2019, Claimant presented with pain in his right shoulder that had been ongoing for the past 8 months. <u>Id.</u> at 613. He did not recall sustaining any injury that brought it on but felt his right side had become very weak. <u>Id.</u> He also reported soreness at the base of his thumbs; and recent x-rays revealed mild arthritis at the carpometacarpal joint. <u>Id.</u> Upon physical examination, Claimant had extremely good motion but presented with some weakness in his bicep and no reflex on his bicep on the right side. <u>Id.</u> at 615. He reported pain with abduction on his right side. <u>Id.</u> X-rays of his shoulder revealed minor wear at the acromioclavicular joint. Id. An exam of both his thumbs shows good function, grip, and strength. <u>Id.</u> Claimant was assessed as having a possible neurological disorder causing the weakness on his right side or possible rotator cuff tears. <u>Id.</u> Claimant was treated with an anti-inflammatory injection. <u>Id.</u> at 616.

On November 6, 2019, Claimant presented with swelling over his left elbow that he believed had started in late-October 2019. <u>Id.</u> at 606. He did not have any loss of function or motion and was able to perform all his normal activities. <u>Id.</u> Claimant was diagnosed with olecranon bursitis and was directed to return if condition worsened. <u>Id.</u> at 608.

In July 2020, Claimant presented to Virginia Mason Medical Center complaining of pain in his wrists, lower back, and heels. <u>Id.</u> at 869. Claimant reported a history of lumbar stenosis and

degenerative spine decease that had been treated with epidural injections; Claimant stated that physical therapy and acupuncture were not helpful and that he was unable to sit or stand for prolonged periods of time or to use his hands for routine tasks, which interfered with his work as a professional photographer.  Id. Claimant further reported that his knee replacement surgery had helped with his bilateral leg pain and that, in general, he felt strong but that too much activity or prolonged sitting would cause muscle spasms in his back.  Id. at 877.  Upon physical examination, it was determined that Claimant could sit for 20 minutes at a time before needing to change positions and could walk without an assistive device.  Id.  Claimant did not exhibit signs of joint tenderness, had full range of motion of the spine, had fully intact lower extremity motor and sensory functions, and had 5/5 strength in all extremities.  Id. at 870.  Claimant had not yet tried physical or occupational therapy for his joint or back pain and was, therefore, prescribed therapy for strengthening.  Id. at 878.

On August 4, 2020, Claimant saw a specialist for evaluation of bilateral radial hand base pain.  Id. at 889.  He reported feeling some relief using Cool Comfort splints.  Id.  A bilateral hand exam revealed Claimant had a positive CMC grind test and did not hyperextend at the MP joints. Id.  X-rays revealed arthrosis in both of Claimant's hands with some degenerative changes, including loss of joint space in both hands.  Id.  Claimant declined surgical treatment and was prescribed occupational therapy and continued use of hand splints.  Id. at 889–90.

### B.  Non-treating Sources

#### 1)  IMA Evaluation, Inc. ("IMA")

On February 24, 2021, Claimant presented to IMA upon referral from the Disability Determination Division for an internal medicine examination.  Id. at 935.  Claimant reported having lower back pain since 2008 and described the pain as intermittent with a severity rating of

6/10.  Id.  Claimant reported that walking, lifting, and carrying objects aggravated the pain and stated that he relied on over-the-counter pain medications to provide relief.  Id.  Claimant also reported that, since his bilateral knee replacement, he no longer felt any knee pain.  Id.  Claimant included playing sports, cooking, and cleaning among his daily living activities.  Id. at 936.  A physical examination revealed that Claimant had a normal gait, could walk on his heels and toes without difficulty, and was able to squat 75% of the way; Claimant did not need assistance getting on or off the examination table and was able to rise from a chair without difficulty.  Id. at 937.  The consultative examiner noticed a slight decrease in range of motion in Claimant's lumbar spine secondary to pain, but straight leg raises were noted as negative bilaterally.  Id. at 938.  Moreover, Claimant's joints were stable and he had 5/5 strength in his upper and lower extremities.  Id.

### 2)  State Agency Medical Consultant Prianka Gerrish, M.D. ("Dr. Gerrish")

On March 4, 2021, Dr. Gerrish conducted a medical evaluation of Claimant and observed that he did not appear to be in any acute distress, had a normal gait, and was able to squat at 75% capacity.  Tr. 74.  Dr. Gerrish also observed that Claimant was able to rise from a chair unassisted and did not have any apparent muscular atrophy.  Id.  Dr. Gerrish also observed that Claimant had normal hand and finger dexterity and had a normal strength of 5/5 in his legs and hands.  Id. at 90–91.  Dr. Gerrish opined that Claimant's functional limitations consisted of lifting or carrying up to 25 pounds and working about 6 hours in an 8-hour workday; and that Claimant had postural limitations, including being limited to occasionally climbing stairs and ladders and occasionally kneeling, crouching, and crawling.  Id. at 88–89.  Dr. Gerrish concluded that, in light of Claimant's reported pain and functional report, a reduction to medium work with postural and environmental limitations was considered fair.  Id. at 91.

### 3)  State Agency Medical Consultant Steven Arkin, M.D. ("Dr. Arkin")

On November 16, 2021, Dr. Arkin completed a medical evaluation of Claimant and agreed with Dr. Gerrish's findings and concluded that Claimant could perform work at the medium exertional level with additional postural and environmental limitations.  Id. at 121–123.

## DISABILITY REPORT

On April 1, 2020, Claimant completed a disability report and listed the following medical conditions: depression, double knee replacement, anxiety, alcoholism, ADHD, and spinal stenosis. Tr. 328.  Claimant indicated that his medical conditions caused him pain but that they did not cause him to make changes to his work activities as a photographer.  Id. at 328–29.  Claimant further indicated that, since the onset of his conditions in August 2015, he had had gross earnings greater than $1,090 per month and in 2019, earned an annual salary of $300,000 working 5 days a week for 8-hour days as a photographer.  Id. Claimant noted that, as a photographer he: frequently lifted objects weighing, at most, 10 pounds; crouched, kneeled, stooped, and reached for small objects for a total of 6 hours a workday; and that he did not supervise others in his occupation.  Id. at 330.

## FUNCTION REPORTS

On April 13, 2020, Claimant's sister, Catherine Micaud ("Ms. Micaud"), completed a third-party function report in which she stated that Claimant suffered from extreme knee and back pain, has difficulty concentrating, and suffered from an impaired memory.  Tr. 341–42.  Ms. Micaud described her brother's daily activities as attending AA meetings, feeding his small dog and changing indoor pee pads for it, cleaning, cooking elaborate meals, and watching TV.  Id. at 342. She listed his past activities as including exercising, skiing, and working most days as a fashion photographer.  Id.  She also listed Claimant's household chores as vacuuming, dishwashing, watering plants outside, mowing, doing laundry, and making home repairs.  Id. at 343.  Claimant

was also able to shop for himself and pay his own bills and, prior to his conditions, Claimant was married and used to attend dinners and go on vacations.  Id. at 345.  Ms. Micaud reiterated these observations in an August 20, 2021, third-party function report.  See id. at 405–07.

Claimant also filled out several function reports, including one on April 14, 2020.  Id. at 350.  There, Claimant stated that his mental health, anxiety, ADHD, alcoholism, and depression made it "almost impossible" for him to hold a job.  Id. at 351.  Claimant also stated that his history of knee and lower back issues affected his ability to lift, squat, and stand for extended periods of time.  Id.  Claimant also stated that he was "very bad" at managing money and that, as a result of his mental and physical conditions, he had lost several jobs.  Id. at 354–55.  Claimant also stated that he used to scuba dive and go to the gym but could no longer do those activities.  Id. at 356.  Instead, his daily activities were limited to reading, repairing things around the house, and watching TV.  Id.

In a function report dated October 2021, Claimant stated that his physical and mental limitations affected his day-to-day activities but that he was able to cook, clean, and repair items around the house.  Id. at 416–17. Claimant also stated that, due to his mental conditions, he had difficulty getting along with family and friends and that he had difficulty handling stress and changes in routine and respecting authority, which made it difficult for him to retain a job.  Id. at 420–21. Claimant also stated that degenerative arthritis in both knees and lower back pain made it difficult to work and that as a result, he lost his photography clients.  Id. at 424.

In an additional report from October 2021, Claimant stated that he was able to fix his own meals, browse on the computer, and work on his photographs, and that he had no issues with personal care tasks.  Id. at 426.  Furthermore, he was able to do household tasks such as laundry,

driving, shopping in stores and by computer, and tending to his financial responsibilities.  Id. at 427.

**HEARING TESTIMONY**

A hearing was held on July 12, 2022, before ALJ Ehrman, at which Claimant and VE McKinney testified.  TR. 16.

### I.      Claimant

Claimant testified that, at the time of the hearing, he lived alone and had been sober for 12 days.  Tr. 34–35.  Claimant further testified that he cooked, cleaned, and shopped for himself but that felt he could not stand for long periods of time.  Id. at 36.  With respect to his former job as a commercial photographer, Claimant stated that he could no longer stand for long periods of time or carry his gear and that his anxiety impeded him from performing the multi-tasking required of the job.  Id.  Claimant also testified that he earned a college degree in photography and managed his daily pain with over-the-counter medications.  Id.

On examination by his attorney, Claimant stated that his anxiety was triggered by his financial instability and was exacerbated by alcohol.  Id. at 39–40.  Claimant further testified that his lower back pain had improved over the years but still caused him pain and, along with arthritis in his wrists, limited his ability to stand and carry equipment while taking photographs.  Id. at 41–42.

### II.      VE McKinney

VE McKinney classified Claimant's prior work as follows:

> ➢ Commercial Photographer, DOT #143.062-030,[5] with an exertional level of light[6] (but based on Claimant's testimony, he probably performed it at a "medium" exertional level) and a Specific Vocational Preparation (hereafter, "SVP") of 7.[7]

Id. at 64.

ALJ Ehrman posed to VE McKinney two hypotheticals for an individual of Claimant's age, with his education and work experience who:

1) Could perform light exertional activity; could occasionally lift and carry 20 pounds; could frequently lift and carry 10 pounds and stand or walk about six hours with customary breaks in an 8-hour workday; should avoid climbing ladders, ropes, or scaffolds; could occasionally climb stairs; could frequently stoop and crouch but only occasionally kneel and crawl; and should avoid exposure to extreme cold, hazards, and unprotected heights. (Hypothetical No. 1).

2) Could perform light exertional activity with the same environmental and physical restrictions as in Hypothetical 1 but with the additional limitation of standing and walking only 4 hours out of an 8-hour workday. (Hypothetical No. 2).

Id. at 42–44.

VE McKinney testified that the individual in Hypothetical Nos. 1 and 2, would not be able to perform Claimant's past work as he actually performed it but could perform it as generally

---

[5] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities and defines the structure and content of all listed occupations. See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

[7] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
An SVP of 7 means that preparation for the job should take "[o]ver 2 years up to and including 4 years". http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

performed in the national economy.  Id. at 43–47.

Claimant's attorney then asked VE McKinney if the way Claimant had described performing his past relevant work was consistent with the way VE McKinney had seen the job performed.  Id. at 45.  VE McKinney responded that he had seen Claimant's past relevant work performed in a variety of areas and settings, but that none of them allowed for a sit/stand option. Id.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

## REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir.

2004).  In this case, ALJ Ehrman determined that Claimant had not engaged in SGA since August 1, 2015, the alleged onset date.  TR. 136, 138.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  <u>Phillips</u>, 357 F.3d at 1237.  In this case, ALJ Ehrman found that Claimant suffered from the following severe impairments: status post bilateral knee arthropathy and replacement; and lumbar spondylolisthesis, with moderate stenosis.  TR. 138.  He found Claimant's mental impairments did not were non-severe because they did not cause any functional limitations.  <u>Id.</u>  ALJ Ehrman then proceeded to step three.  <u>Id.</u>

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  <u>Phillips</u>, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  <u>Id.</u>  Here, ALJ Ehrman determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 24.  Therefore, ALJ Ehrman proceeded to step four.  <u>Id.</u>

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  <u>Phillips</u>, 357 F.3d at 1238.  As to the first prong, ALJ Ehrman determined that Claimant had the RFC to:

> Perform light work as defined in CFR 404.1567(b) and 416.967(b); except the Claimant can occasionally lift and carry 20 pounds, and frequently lift or carry 10 pounds; stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, with normal and customary breaks.  No climbing of ladders, ropes, and scaffolds; frequently climb/navigate ramps; occasionally cline one set of stairs; can frequently balance, stoop, and crouch, but only occasionally kneel and crawl; avoid concentrated exposure to extreme cold, vibration and hazards to include unprotected heights.

TR. 139–40.  Based on Claimant's RFC, ALJ Ehrman moved to prong two of step four and concluded that Claimant was able to perform his past relevant work as a commercial photographer; and that such work did not require the performance of work-related activities precluded by Claimant's RFC.  Id. at 144.  Thus, ALJ Ehrman concluded that Claimant was not under a disability, as defined in the Social Security Act, from August 1, 2015, through the date of the Unfavorable Decision and the sequential evaluation process ended at step four.  Id. at 145.[8]

## DISCUSSION

As noted above, Claimant argues that:

I.      The ALJ's step-four analysis was incorrect because he failed to characterize Claimant's past relevant work of Commercial Photographer as a composite job.

II.     The ALJ's finding that Claimant was able to perform his past relevant work is not supported by substantial evidence.

See Claimant's Motion for Summary Judgment [D.E. 12].  The undersigned finds no merit in either of these contentions.

### I.      ALJ's Characterization of Claimant's Past Relevant Work

Claimant argues that the ALJ failed to properly characterize Claimant's past relevant work as a "composite job," consisting of Commercial Photographer and Photographer Helper with a medium exertional level, which resulted in a flawed-step four analysis.  Id. at 4.  More specifically, Claimant argues that, at all relevant times, he consistently described his job as a composite Commercial Photographer/Photographer Helper position, which is a medium exertional job that would have precluded the ALJ's RFC finding that Claimant can perform light exertional work as

---

[8] ALJ Ehrman did not proceed to the fifth step because he determined that Claimant was able to perform his past relevant work.  TR. 30–31.  At the fifth step, the ALJ would have had to show that Claimant has the ability to perform work that is available in significant numbers in the national economy, considering his RFC, age, education, and work experience.  Phillips, 357 F.3d at 1239–4; 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(1), (4)(i)(v).

just a Commercial Photographer.  Id. at 5.  The Commissioner responds that Claimant waived any objection to the ALJ's characterization of Claimant's past relevant work; and that Claimant failed to meet his burden of showing that his previous work was a composite job.  See Commissioner's Motion for Summary Judgment [D.E. 14 at 5–7].

At the administrative hearing, VE McKinney classified Claimant's past relevant work as a Commercial Photographer with a light exertional level but acknowledged that, as Claimant described the job, he probably performed it at a medium exertion level.  Tr. 33.  When given the opportunity to object to VE McKinney's classification, Claimant's counsel responded that he had "no objections to that classification."  Id.  Therefore, having indicated through his attorney that he had no objection to the classification of his past relevant work as a commercial photographer, Claimant waived the objection.  See Allen v. Saul, No. 8:19-cv-1741-T-CPT, 2020 WL 5542820, at *5 (M.D. Fla. Sept. 15, 2020) (plaintiff's counsel did not object at the hearing to the classification of plaintiff's past relevant work as a non-composite job); McDaniel v. Kijakazi, No. 22-cv-21201, 2023 WL 5510277, at * 15 (S.D. Fla. Aug. 10, 2023) (plaintiff waived her objection that her past relevant work was constituted a composite job when she failed to object to the vocational expert's classification).

Additionally, a claimant bears the burden of proving that he or she could not perform his or her past relevant work as he or she performed it or as the work is generally performed in the national economy.  Jackson v. Bowen, 801 F.2d 1291, 1293–94 (11th Cir. 1986).  Here, Claimant gave a detailed description of his past work experience and, based on that detailed description, VE McKinney testified that Claimant had worked as a commercial photographer, which was classified as light, skilled work in the DOT, though Claimant probably performed the work at a medium exertion level.  Tr. 29–33.  Upon questioning by the ALJ as to whether an individual with

Claimant's vocational factors and RFC could perform his past relevant work, the expert indicated the individual could perform the job as generally performed in the national economy, though not as Claimant had actually performed the job.  Id. at 43–47.  The vocational expert's testimony provides substantial evidence to support ALJ Ehrman's determination that Claimant's past relevant work was that of a commercial photographer, and Plaintiff failed to show otherwise.  See McDaniel, 2023 WL 5510277, at * 15 ("Without an objection or other reason to doubt her credibility, the VE's experience provides substantial evidence to support the ALJ's reliance on the VE's testimony.").  Hence, there is no error in ALJ Ehrman's characterization of Claimant's Past Relevant Work.

## II.    Claimant's Ability to Perform Past Relevant Work

Claimant further argues that the ALJ's determination that Claimant could perform his past relevant work was not supported by substantial evidence because the ALJ failed to conduct a "paragraph B" assessment of Claimant's mental impairments and failed to consider Claimant's functional limitations from his bilateral knee impairments that existed prior to Claimant's date-last-insured in December 2016.  See Claimant's Motion for Summary Judgment [D.E. 12 at 12–14].  The Commissioner responds that the ALJ's RFC determination was supported by substantial evidence because the ALJ cited substantial evidence in support of his findings that Claimant did not have a severe mental impairment and did not have severe knee pain for the period prior to his date-last-insured.  See Commissioner's Motion for Summary Judgment [D.E. 14 at 10–12].

"An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities."  Chereza v. Comm'r, 379 F. App'x 934, 940 (11th Cir. 2010) (citing 20 C.F.R. § 404.1521(a); Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir.

1997)).[9]  ALJs rate the degree of a claimant's mental ability limitations by conducting an analysis of four broad functional areas known as the "paragraph B" criteria, namely: understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself.   20 C.F.R. §§ 4040.1520a(c)(3), 416.920a(c)(3).  If the ALJ rates "the degrees of [a claimant's impairments] as 'none' or 'mild', [the Commissioner] will generally conclude that [claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities".  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, ALJ Ehrman reviewed Claimant's history of mental impairments, including anxiety, depression, bipolar disorder, and ADHD, and noted that the treatment notes showed "very little" abnormal findings and that Claimant's mental examinations consistently revealed he had normal mood, affect, and speech.   Tr. 138.   Additionally, Claimant admitted that his anxiety and depression were adequately controlled by medication and only typically worsened with alcohol.  Id. at 138, 597, 603, 946.  ALJ Ehrman also evaluated Claimant's function reports and found that both  Claimant  and  his  sister  reported  that  Claimant  had  no  issues  with  understanding, remembering, or applying information during daily activities such as paying bills, shopping, or looking after himself.   Id. at 345, 426.   Based on these observations, ALJ Ehrman found that Claimant's mental impairments were only mild in nature; hence, non-severe.  Tr. 139.  Given this determination, the ALJ did not err in failing to conduct a "paragraph B" assessment of Claimant's mental impairments.  See Bradley v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984) (an impairment

---

[9] Basic Work Activities is defined as "the abilities and aptitudes necessary to do most jobs.  Examples of these include – (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).

is not severe if "it has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work"); Sprague v. Colvin, No. 8:13-CV-576-T-TGW, 2014 WL 2579629, at *6 (M.D. Fla. June 9, 2014) (finding RFC that omitted mental limitations was supported by substantial evidence where ALJ found that claimant had no more than mild limitations in any of the paragraph B functional areas).

With respect to Claimant's knee impairments, ALJ Ehrman determined that Claimant's knee impairments were non-severe prior to his date-last-insured in December 2016.  Tr. 141.  In connection with this determination, ALJ Ehrman discussed that, prior to Claimant's alleged onset date of disability, Claimant's physical examinations of his knees indicated that the joint lines were nontender and were stable, Claimant had normal range of motion with no crepitus, and that straight leg raising tests were negative bilaterally.  Id. at 141, 708.  ALJ Ehrman acknowledged that, although Claimant had complained of some knee pain prior to his date-last-insured, Claimant nevertheless was going to Peru for a detox program, which showed an ability for Claimant to sit longer that he alleged.  Id. at 141, 477.  Moreover, a physical examination from February 2016 also showed no evidence of instability of Claimant's knees, and Claimant had normal gait and strength in all of his extremities.  Id.  Thus, ALJ Ehrman's conclusion that Claimant's knee impairments were non-severe prior to his date-last-insured was supported by substantial evidence. See Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) ("Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion."); Mitchell v. Comm'r Soc. Sec. Admin., 771 F.3d 780, 782 (11th Cir. 2014) (a court "may not decide facts anew, reweigh the evidence, or substitute its

judgment for that of the Commissioner"). Hence there is no error in ALJ Ehrman's assessment of Claimant's ability to perform Past Relevant Work.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 12] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 14] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Cecilia M. Altonaga, United States District Judge. Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 20th day of October, 2023.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Judge Cecilia M. Altonaga
        Counsel of Record